IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
(<u>Electronically Filed</u>)

| | | |
|---|---|---|
| HOLLEY PERFORMANCE PRODUCTS, INC., a Delaware corporation, | § § § | |
| **Plaintiff,** | § § | |
| v. | § § | CIVIL ACTION NO. 1:10CV-180-R |
| TUCOWS, INC., a Pennsylvania corporation, and TUCOWS.COM CO., a Nova Scotia corporation. | § § § § | JURY TRIAL DEMANDED |
| **Defendants.** | § | |

## COMPLAINT

Plaintiff, Holley Performance Products, Inc. ("Holley"), for its Complaint against Defendants Tucows, Inc. and Tucows.com Co. (collectively "Tucows") hereby states and alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1.    Plaintiff Holley is a Delaware corporation with its principal place of business in Bowling Green, Kentucky.

2.    Defendant Tucows, Inc. is a Pennsylvania corporation with its principal office in Toronto, Canada and offices in Starkville, Mississippi and London, U.K.   Tucows offers Internet-based services and products, including Internet domain name registration and management.   (*See* Group Exhibit ("Exh.") 1.)   Tucows purports to be the "largest ICANN accredited wholesale domain registrar" and offers .COM, .NET, .ORG, .US, and .BIZ top-level

domain extensions, among others.  (*Id*.)  A .US domain extension indicates an origin in the United States.

3.     Defendant Tucows.com Co. is a Nova Scotia corporation and a wholly-owned subsidiary of a Delaware corporation (Tucows (Delaware) Inc.) which, in turn, is a wholly-owned subsidiary of Tucows, Inc.  (*Id*.)

4.     On information and belief, Tucows, Inc. utilizes Tucows.com Co. primarily or exclusively as the registrant for, and holder of, over 150,000 Internet domain names.  Tucows, Inc. represents to the public, investors and potential investors that it owns and/or holds this large portfolio of domain names.  (*See* Exh. 2.)

5.     Tucows, Inc. and Tucows.com Co. share common executive management. Specifically, Elliot Noss is a Director and the Treasurer & Secretary of Tucows.com Co., on the one hand, and the President and Chief Executive Officer of Tucows, Inc., on the other hand. Likewise, Michael Cooperman, is a Director and the President of Tucows.com Co., on the one hand, and the Chief Financial Officer of Tucows, Inc., on the other hand.  (*See* Exh. 3.)

6.     On information and belief, Tucows, Inc. exercises control over the day-to-day activities of Tucows.com. Co. and Tucows.com Co. essentially functions as a department within Tucows, Inc.  As such, Tucows.com Co. is the alter ego of Tucows, Inc.

7.     In its most recent quarterly statement (Form 10-Q) filed with the U.S. Securities and Exchange Commission (the "SEC") on November 12, 2010, Tucows reported that (a) as of September 30, 2010, approximately 42% of its property and equipment is located in the United States, as calculated in U.S. dollars, and (b) its "sales and marketing" expenses for the first nine (9) months of 2010 were $5,480,228.00.[1]

---

[1] *See* www.sec.gov/Archives/edgar/data/909494/000110465910057818/a10-17328_110q.htm.

8.     This Court has personal jurisdiction over Tucows because it has engaged in acts outside this Judicial District causing injury within this Judicial District and by reason of the nature of its particular business and operations, which gives Tucows a virtual presence throughout the United States, including in the Commonwealth of Kentucky.  In addition, on information and belief, Tucows (a) conducts substantial business in the Commonwealth of Kentucky by providing, selling and offering Internet-related products and services to Kentucky residents, (b) has a business model that focuses on customers and potential customers in the United States and it derives a majority of its revenue from customers in the United States; (c) has customers within the Commonwealth of Kentucky, (d) advertises and markets its products and services in the United States, including in the Commonwealth of Kentucky, and (e) has otherwise made or established contacts with this judicial district sufficient to permit the exercise of personal jurisdiction.

9.     This is an action for cybersquatting under 15 U.S.C. § 1125(d), for trademark infringement under 15 U.S.C. § 1114(1), for false designation of origin and unfair competition under 15 U.S.C. § 1125(1), for unjust enrichment under state common law, and for unfair competition under state common law.

10.     This court has subject matter jurisdiction over the federal claims pursuant to 15 U.S.C. § 1121, 28 U.S.C. §§ 1331 and 1338(a).  This Court has supplemental jurisdiction over claims arising under the common law of the Commonwealth of Kentucky pursuant to 28 U.S.C. §§ 1338(b) and 1367(a) because those claims are joined with substantial and related federal trademark claims and are otherwise so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because Holley is a resident of this District and because a substantial portion of the acts or omissions giving rise to the claim and the threatened and actual harm to Holley occurred in this District by reason of Tucows' conduct as alleged herein.

FACTS

A.    **Holley's Business and the Earl's Products.**

12.    Holley is a leading manufacturer of high-performance automotive equipment and accessories. Holley has manufactured and sold high-performance automotive products in the United States since 1905.  Holley is acclaimed and well-known both here in the United States and internationally for the success and desirability of its products in the high-performance automotive industry and its extensive and longstanding international marketing of such products.

13.    The high-performance automotive products manufactured and sold by Holley include parts and fittings for vehicles and vehicle engines, hydraulic hoses, hydraulic hose end adaptors and fittings, clamps, couplings, and connectors, as well as oil coolers for cooling oil in internal combustion engines and in automatic transmissions for land vehicles.  These products are sold by Holley under the EARL'S trademark and tradename and are collectively referred to herein as the "Earl's Products."

14.    Holley and its predecessors-in-interest have sold and marketed the Earl's Products since at least as early as 1955.   Holley is internationally acclaimed for both the success and desirability of its Earl's Products in the high-performance automotive industry and for its extensive international marketing of such products.

B.  **Holley's Rights in the Earl's Marks.**

15.    Holley owns numerous long-standing and well-known trademarks, trade names and logos that are used in connection with the promotion and sale of the Earl's Products (the "Earl's Marks").

16.    The Earl's Marks and underlying goods are widely known and recognized among consumers and members of the high-performance automotive industry, including in the United States, Canada and internationally.

17.    Holley is the exclusive owner of the following valid and enforceable trademark registrations with the United States Patent and Trademark Office for its various Earl's Marks:

a.  **EARL'S** - U.S. Reg. No. 1,293,499, registered September 4, 1984 for use with "retail store services specializing in the sale of hydraulic hose, hose end and adaptor fittings and assemblies thereof" in International Class ("IC") 42 (used in U.S. interstate commerce since at least as early as 1955 and incontestable under 15 U.S.C. § 1065);

b.  **EARL'S** - U.S. Reg. No. 1,723,592, registered October 13, 1992 for use with "oil coolers for cooling oil in internal combustion engines and automatic transmissions for land vehicles" in IC 12 (used in U.S. interstate commerce since at least as early as 1955 and incontestable under 15 U.S.C. § 1065);

c.  **EARL'S** - U.S. Reg. No. 1,295,677, registered September 18, 1984 for use with "hydraulic hose end and adapter fittings made of metal" in IC 6 (used in U.S. interstate commerce since at least as early as 1955 and incontestable under 15 U.S.C. § 1065);

d.   - U.S. Reg. No. 1,297,124, registered September 18, 1984 for use with "retail store services specializing in the sale of hydraulic hose, hose end and adapter fittings and assemblies thereof" in IC 42 (used in U.S. interstate commerce since at least as early as April, 1972 and incontestable under 15 U.S.C. § 1065);

e.    - U.S. Registration No. 1,295,676, registered September 18, 1984 for use with "hydraulic hose end adapter fittings made of metal" in IC 6 (used in U.S. interstate commerce since at least as early as April, 1972 and incontestable under 15 U.S.C. § 1065);



f.    - U.S. Registration No. 1,706,754, registered August 11, 1992, for use with "hydraulic hoses of non-metallic material with or without metal sheaths for transmitting hydraulic fluids within internal combustion engines" in IC 17 (used in U.S. interstate commerce since at least as early as April, 1972 and incontestable under 15 U.S.C. § 1065);



g.    - U.S. Registration No. 2,471,006, registered July 24, 2001, for use with, among other products, "metal fittings for hose ends of automotive fuel, oils, and coolant transferring" in IC 6; "heat exchanger in the nature of an oil cooler for dissipating heat in automotive engine-oil systems" in IC 7; "manually operated hand tools for automotive use" in IC 8; "automotive brake hoses used to transfer automotive brake fluid" in IC 12; "stainless steel-braided rubber hoses with interiors coated with non-stick solution for automotive hydraulic applications" in IC 17 (used in U.S. interstate commerce since at least as early as 1972 and incontestable under 15 U.S.C. § 1065);

h.    **EARL'S PERFORMANCE PRODUCTS** - U.S. Registration No. 1,293,522, registered September 4, 1984, for use with "retail store services specializing in the sale of hydraulic hose, hose end and adapter fittings and assemblies thereof" in International Class 42 (used in U.S. interstate commerce since at least as early as January, 1980 and incontestable under 15 U.S.C. § 1065);

i.    **EARL'S SUPPLY** - U.S. Registration No. 1,293,498, registered September 4, 1984 for use with "retail store services specializing in the sale of hydraulic hose, hose end and adapter fittings and assemblies" in IC 42 (used in U.S. interstate commerce since at least as early as 1955 and incontestable under 15 U.S.C. § 1065); and

6

     j.   **EARL'S SUPPLY CO.** - U.S. Registration No. 3,559,440, registered January 13, 2009, for use with "sportswear apparel for men and women, namely, t-shirts" in IC 25 (used in U.S. interstate commerce since at least as early as January 1, 1983).

True and correct copies of the foregoing Certificates of Registrations (along with relevant assignment records) are attached hereto as Group Exhibit 4.

    18.    Holley is also the exclusive owner of the following valid and enforceable trademark registrations from the European Union, Australia, U.K, Japan and Hong Kong for its various Earl's Marks:

    a.   **EARL'S** - Community Trademark Registration No. 221,952, registered January 19, 1999, for use with "hydraulic hose ends and adaptor fitting made of metal" in IC 6; "oil coolers for cooling oil in internal combustion engines and automatic transmissions for land vehicles" in IC 12; and "hydraulic hoses of no-metallic material with or without metal sheaths for transmitting hydraulic fluids with internal combustion engines" in IC 17;

    b.   **EARL'S PERFORMANCE PRODUCTS** - Community Trademark Registration No 221,937, registered January 20, 1999, for use with "hydraulic hose ends and adaptor fitting made of metal" in IC 6; "oil coolers for cooling oil in internal combustion engines and automatic transmissions for land vehicles" in IC 12; and "hydraulic hoses of no-metallic material with or without metal sheaths for transmitting hydraulic fluids with internal combustion engines" in IC 17;

    c.   **EARL'S** **PERFORMANCE PRODUCTS** - Australia Trademark Registration No. 518,560, registered February 17, 1993, for use with "machine parts in this class for use on land and marine vehicles including valves, carburetors, filters, separators, and sealing joints" in IC 7;

    d.   **EARL'S** **PERFORMANCE PRODUCTS** - Australia Trademark Registration No 517,636, registered October 29, 1992, for use with "automotive and marine parts and accessories in this class, including fluid control products" in IC 12;

e.    - Australia Trademark Registration No. 518,559, registered September 6, 1989, for use with "machine parts in this class for use on land and marine vehicles including valves, carburetors, filters, separators, and sealing joints" in IC 7;

f.    - Australia Trademark Registration No. 517,635, registered September 23, 1989, for use with "automotive and marine parts and accessories in this class, including fluid control products" in IC 12;

g.   **EARL'S** - United Kingdom Trademark Registration No. 1,457,030, registered March 18, 1994, for use with "flexible hoses and pipes, all made wholly or principally of metal or of plastic materials and/or of rubber and metal, the metal predominating; pipes, pipes of metal; brake pipes, adaptors, couplings and connectors for all of the aforesaid goods" in IC 6;

h.    - United Kingdom Trademark Registration No. 1,457,028, registered March 4, 1994, for use with "flexible hoses and pipes, all made wholly or principally of metal or of plastic materials and/or of rubber and metal, the metal predominating; pipes, pipes of metal; brake pipes, adaptors, couplings and connectors for all of the aforesaid goods" in IC 6;

i.   **EARL'S** - Japan Trademark Registration No. 1,829,117, registered December 25, 1985, for use with, among other things, "shafts, bearings, shaft couplings, bearings (machine elements for land vehicles), power transmissions (machine elements for land vehicles), shock absorbers and springs (machine elements for land vehicles), brakes (for land vehicles)" in IC 12;

8

j.  - Japan Trademark Registration No. 1,893,758, registered September 29, 1986, for use with, among other things, "heat exchangers in the nature of an oil cooler for dissipating heat in automotive engine-oil systems" in IC 7; "automotive brake hoses used to transfer automotive brake fluid, parts and fittings for, vehicles and vehicle engines" in IC 12;

k. **EARL'S** - Hong Kong Trademark Registration No 12528/98, registered December 2, 1998, for use with, among other things, "parts and fittings for vehicles and vehicle engines; hoses, hose adaptors and fittings, clamps, couplings and connectors, all being parts for vehicles and vehicle engines" in IC 12;



l.  - Hong Kong Trademark Registration No. 2088/99, registered February 24, 1999, for use with, among other things, "parts and fittings for vehicles and vehicle engines; hoses, hose adaptors and fittings, clamps, couplings and connectors, all being parts for vehicles and vehicle engines" in IC 12; and

m. **EARL'S PERFORMANCE PRODUCTS** - Hong Kong Trademark Registration No 13308/98, registered December 21, 1999, for use with, among other things, "parts and fittings for vehicles and vehicle engines; hoses, hose adaptors and fittings, clamps, couplings and connectors, all being parts for vehicles and vehicle engines" in IC 12.

True and correct copies of the foregoing Certificates of Registrations (along with relevant assignment records) are attached hereto as Group Exhibit 5.

19. In addition to Holley's primary Internet website, located at the domain name www.holley.com, Holley owns domain names that incorporate the EARL'S mark, including www.earlsplumbing.com, www.earls.co.uk, www.buyearls.com, and www.buyearls.net. These domain names host and redirect customers and potential customers to websites operated by Holley that provide information on the Earl's Products. Printouts from several of these websites evidencing such use of the Earl's Marks are attached here as Exhibit 6.

20.     Holley spends many millions of dollars each year to advertise and promote its high-performance aftermarket automotive products and related products, including the Earl's Products, under its proprietary trademarks through print media, the Internet, direct marketing campaigns, and many other advertising mediums.  Between 2002 and 2008, for example, Holley spent in excess of approximately $17,400,000 on advertising and promotions under its proprietary marks, including the Earl's Marks.

21.     As a result of its extensive worldwide marketing efforts and its continuous use of the Earl's Marks for many decades, Holley has developed substantial rights and goodwill in the Earl's Marks, and the public has come to associate such marks with Holley as the source of origin of its well-regarded Earl's Products.

**C.     Tucows and the Earls.Com Domain Name.**

22.     Tucows is not known by the name "Earls."  It does not own any trademark or other rights in the word "Earls."  Tucows has not been licensed or otherwise authorized by Holley to use any of the Earl's Marks.  Nevertheless, Defendant Tucows.com Co. is the listed registrant of the domain name EARLS.COM (the "Infringing Domain") and Defendant Tucows, Inc. is the listed registrar.  (*See* Exh. 7 hereto).

23.     Tucows and/or any predecessors-in-interest, registered the Infringing Domain long after Holley's first use of the Earl's Marks in 1955 and well after Holley obtained nine of the ten U.S. trademark registrations it owns in connection with the Earl's Marks.

24.     On its face, the Infringing Domain is substantially identical, and confusingly similar, to the Earl's Marks.  Specifically, the Infringing Domain consists entirely of the dominant distinctive component of the Earl's Marks, namely, the EARL'S word element.  The Infringing Domain differs only by the lack of an apostrophe between the last two letters of "EARLS" in the Infringing Domain.

25.     The omission of an apostrophe does nothing to distinguish the Infringing Domain from the Earl's Marks because "Earl's" and "Earls" are phonetic equivalents and, more significantly, domain names cannot incorporate apostrophes.  Thus, for any company name and/or brand name that incorporates an apostrophe, especially the possessive form of a name, consumers expect the corresponding domain names to omit that punctuation.  For example, the primary domain names used by all of the following businesses necessarily omit the apostrophe: (a) McDonald's - www.mcdonalds.com, (b) Wendy's restaurants - www.wendys.com, (c) Papa John's Pizza - www.papajohns.com, (c) Arby's restaurants - www.arbys.com, (d) Hardee's restaurants - www.hardees.com, (e) Domino's Pizza - www.dominos.com, (f) Culver's restaurants - www.culvers.com, (g) Denny's restaurants - www.dennys.com. (h) Chili's restaurants - www.chilis.com, (i) Applebee's restaurants - www.applebees.com, (j) Macy's department stores - www.macys.com, (k) Kohl's department stores - www.kohls.com, (l) Dillard's department  stores - www.dillards.com, and (m) Lowe's Home Improvement - www.lowes.com.  (*See* Group Exh. 8.)  Accordingly, the Infringing Domain is substantially and confusingly identical to the Earl's Marks.

26.     Likewise, as the possessive form of a proper name, consumers would understand the website EARLS.COM – as with most of the companies referenced in the prior paragraph – to refer to a business, *e.g.,* Earl's Plumbing, McDonald's hamburgers, etc.

27.     EARLS.COM, like the other domain names listed above, has a .COM top-level domain extension, which is derived from the word *commercial* and indicates that it is associated with a commercial entity.  (*See* Exh. 9.)  Other top-level domains include .NET (derived from *network*, indicating an organization involved in networking technologies, such as Internet service providers), .ORG (derived from *organization*, indicating a non-profit organization or

organization of a non-commercial nature), .EDU (indicating an *educational* institution), .GOV (restricted to use by *government* entities in the United States), and .MIL (restricted to use by the United States *military*).  (*Id.*)

28.     Consumers associate .COM top-level domains with businesses such as Holley and with brand names for products like the Earl's Products.  Customers and potential customers searching for the Earl's Products on the Internet would thus look for, and expect, a web site relating to those products to be located at a .COM domain name such as EARLS.COM.

29.     Presently, a Google search for "Earls.com" by a customer or potential customer who wishes to purchase or obtain information about the Earl's Products over the Internet produces search results that display the Infringing Domain first, and the web page from Holley's primary website showing the Earl's Products, third.  (*See* Exh. 10.)

30.     The Infringing Domain is one of the over 150,000 domain names in Tucows' "domain name portfolio" through which it attempts to extract revenue through all available means.  In a news release posted on its website, Tucows, Inc. stated, in relevant part, as follows with respect to its "key domain name portfolio assets":

> [A]s of February 14, 2008 the Company had over 150,000 Internet domain names in its private domain name portfolio, including the following:
>
> - Over 1,000 "Gems." These domain names are considered to have the highest potential value in the portfolio. ….
>
> - 39,000 Surnames. Tucows owns over 65 percent of North American's surnames as domain names. These surnames form the foundation of Tucows' Personal Names Service, a recently launched service that allows users to obtain their personal name, for example amy@smith.net for email and amy.smith.net for a web address.
>
> - 22,000 Brandable Names. A brandable domain name is intended to stick in the heads of users and conveys the nature of the website it leads to or the business it represents. These domains are sold or leased to business owners and individuals focused on building a brand.

- 88,000 Direct Navigation Names. Direct navigation names are primarily monetized through targeted pay-per-click advertising.

"In today's marketplace, domain names are essential for marketing and brand awareness," said Elliot Noss, President and CEO of Tucows. "Companies, both large and small, are willing to invest in high-quality domain names to ensure visibility of their brands and steady traffic to their websites."

"Over the past two years, Tucows has built a portfolio of domain names that we view as one of the best in the world. We have sold thousands of these names to date, and we will continue to pursue sales of domain names from our portfolio both individually and as bundles."

(*See* Exh. 2.)

31.     Because consumers would view EARLS.COM as the possessive form of the name "Earl" and as denoting a business (especially because it is attached to a .COM top-level domain), the Infringing Domain appears to be, in the context of Tucows vast portfolio of domain names: (a) a brandable name "intended to stick in the heads of users and convey[] the nature of the website it leads to or the business it represents," and/or (b) a direct navigation name that is "primarily monetized through targeted pay-per-click advertising." (*Id*.)

32.     Importantly, Tucows has used the Infringing Domain as a "parked" and/or "portal" web page that serves to redirect consumers, via "pay-per-click" advertising, to commercial third-party websites not affiliated with Holley, but which compete with Holley and the Earl's Products, for Tucows' own economic gain and without license or consent from Holley.

33.     Specifically, attached hereto as Exhibit 11 is a true and correct copy of the web page located at Infringing Domain as of August 25, 2008. This web page lacks any substantive content. Instead, it displays the text "performance products" at the top with that same text repeated under the headings "Related Searches." And under the title "Sponsored Listings," the following text and link, among others, is provided:

13

**Performance Products**
Parts & accessories for your special car.  Secure online ordering.
www.PerformanceProducts.com

34.    "Performance Products" is part of Holley's corporate name, "Holley Performance Products, Inc.," and a component in one of the Earl's Marks – EARL'S PERFORMANCE PRODUCTS®.

35.    A customer or potential customer searching for Earl's Products who visited the web page attached as Exhibit 11 would thus be led to www.PerformanceProducts.com which, in turn, provides links to www.automotion.com, www.PerformanceProducts4Trucks.com, and www.PerformanceProducts4Benz.com, all of which host web sites that sell and offer for sale an array of automotive products similar to the Earl's Products and other products sold by Holley. (*See* Group Exh. 12.)

36.    Tucows' most recent quarterly report filed with the SEC (Form 10-Q), describes how it generates revenue from these "sponsored listings":

> We derive revenue from our portfolio of domain names by displaying advertising on the domains and by making them available for sale or lease. In addition we display advertising on "parked pages" within OpenSRS.  Parked pages are domain names registered with us that do not yet contain an active website.  When a user types one of these domain names into a web browser, they are presented with dynamically generated links that are pay-per-click advertising.  Every time a user clicks on one of these links, it generates revenue for us through our partnership with third-parties who provide syndicated pay-per-click advertising.[2]

37.    On information and belief, Tucows.com Co. and Tucows, Inc. each profit from the monetization of the Infringing Domain, including the advertisements thereon, and have a licensing agreement or other arrangement between them in this regard.

38.    Tucows has thus used the Infringing Domain to divert Internet users looking for Earl's Products to a website located at the Infringing Domain and through which those users

---

[2] *See* www.sec.gov/Archives/edgar/data/909494/000110465910057818/a10-17328_110q.htm.

would encounter sponsor links, unrelated to and not approved by Holley, which, when clicked on by such user, would yield "click-through" revenue to Tucows.  Therefore, Tucows has used the Infringing Domain to attract, for commercial gain, Internet users to its competing website, all as a result of the use of a domain name that is substantially and confusingly identical to Holley's Earl's Marks.

39.     At least as recently as June 23, 2010, the Infringing Domain displayed a web page featuring "Recommended Links" and "Popular Links."  (*See* Exh. 13.)  Presently, the website located at the Infringing Domain states, among other things, that this "domain is part of an exclusive collection of 'shared' personal names that allows multiple users to have simple, memorable email addresses, such as you@earls.com, all sharing the same domain name." (*See* Exh. 14.)  According to Tucows, its "Personal Names Service can offer a suitable domain name for the top 100 surnames in the U.S. (according to 2000 U.S. Census data)."  (*See* Exh. 15.)

40.     "Earl" (without an "s") is commonly understood as a first name.  It is also a somewhat uncommon last name.  According to United States Census Bureau, 15,437 people in the U.S. have "Earl" as a last name and it ranks 2,170[th] on the list of last names.[3]  In sharp contrast, only 5,865 people in the U.S. have the last name "Earls" (with an "s") which ranks 5,457[th] on the list of last named and represents a negligible 0.003% of the overall population. (*Id*.)  "Earls" is an exceedingly rare name.

**D.      The UDRP Complaint Filed by Holley Against Tucows.**

41.     In light of Tucows' infringing conduct and its efforts to trade on Holley's Earl's Marks, Holley initiated an arbitration proceeding on June 30, 2010 in accordance with the Universal Domain Name Resolution Process ("UDRP") by submitting a Complaint to the

---

[3] *See* http://www.census.gov/genealogy/www/data/2000surnames/index.html ("File B: Surnames Occurring 100 or more times" at bottom of web page).

National Arbitration Forum ("NAF").  The UDRP is a process established by the Internet Corporation for Assigned Names and Numbers ("ICANN") for the resolution of disputes regarding the registration of domain names.  NAF is one of several organizations selected by ICANN to resolve UDRP complaints.

42.    As an ICANN-accredited registrar and the registrant of the Infringing Domain, Tucows has agreed to abide by the UDRP process and related policies, and agreed to submit to the "mandatory administrative proceeding" filed by Holley with NAF.  (*See* Exh. 15, UDRP Policy, at Sec. 4(a)).  And while the UDRP Policy allows Tucows to submit "the dispute to a court of competent jurisdiction resolution," that can only be done "*before* [any] mandatory administrative proceeding is commenced or *after* such proceeding is concluded."  (*Id.*, at Sec. 4(k), emphasis added).

43.    Nevertheless, on July 8, 2010, before its response was due in the UDRP proceeding, Tucows filed a Statement of Claim with the Ontario Superior Court of Justice which sought to undermine the UDRP proceeding and have a Canadian court resolve the dispute involving the Infringing Domain.  Holley was not served with the Statement of Claim in the Canadian matter until November 2nd and any response or appearance by Holley is not due until December 13th.

44.    Holley has not accepted the jurisdiction of the Ontario Superior Court of Justice and is taking procedural steps in that Court to stay that proceeding on the basis that the Province of Ontario is not the proper forum for this dispute.

45.    On information and belief, Tucows initiated the Canadian litigation, at least in part, to avoid the effects of an August 21, 2008, UDRP ruling involving similar facts, in which a three-member arbitration panel of the WIPO (World Intellectual Property Organization)

Arbitration and Mediation Center ruled against Tucows and in favor of Pernod Ricard with respect to the domain name ricard.com. (*See* Exh. 16.) That domain name was transferred from Tucows to Pernod Ricard, which sells various wines and/or aperitifs in connection with its RICARD brand.

46.     On or about August 20, 2010, even though the UDRP Rules and Policy precluded Tucows from avoiding the mandatory arbitration proceeding since Holley's complaint was instituted before the Canadian litigation and the proceeding had not concluded, the NAF improperly dismissed Holley's UDRP complaint without prejudice in light of the Canadian litigation.

**E.     Harm to Holley and the General Public.**

47.     Tucows' unauthorized registration and use of the Infringing Domain is likely to cause confusion, mistake, and deception as to the source or origin of the Infringing Domain, and is likely to falsely suggest a sponsorship, connection, license, or association of Tucows and the Infringing Domain with Holley.

48.     Tucows' activities have harmed and, if not enjoined, will continue to harm Holley and the long-used and federally-registered Earl's Marks.

49.     Tucows' activities have harmed, and if not enjoined, will continue to harm the general public which has an inherent interest in being free from confusion, mistake and deception.

**COUNT I: Cybersquatting on the Infringing Domain Under 15 U.S.C. § 1125(d)**

50.     Holley realleges and incorporates by reference Paragraphs 1 through 49 as if fully set forth herein.

51.     Tucows and/or any predecessors-in-interest registered and used the Infringing Domain.

52.     The Earl's Marks were distinctive and registered with, among other governmental entities, the United States Patent and Trademark Office, at the time that Tucows and/or any predecessors-in-interest registered and used the Infringing Domain.

53.     The Infringing Domain is substantially similar and/or identical to the Earl's Marks.

54.     Tucows does not have any intellectual property rights or any other rights in the Earl's Marks.  And the Infringing Domain does not consist of the legal name of Tucows or a name that is otherwise associated with or used in anyway to identify Tucows.

55.     Tucows has registered, trafficked in, and/or used the Infringing Domain in bad faith and with a bad faith intent to profit from the goodwill long established by Holley in the Earl's Marks, as evidenced by its use of the Infringing Domain as a portal to lead customers and potential customers to websites that sell products similar to the Earl's Products and other products sold by Holley.  Further, by incorporating the EARL'S mark into the Infringing Domain, Tucows is diverting Internet traffic destined for Holley's website to the Infringing Domain instead.

56.     Tucows' bad faith intent to profit from the Earl's Marks is also shown by the fact that a quick search of the Internet (*e.g.,* via Google) or the website of the U.S. Patent and Trademark Office would have led Tucows directly to Holley, the Earl's Marks and the underlying Earl's Products.  Upon information and belief, Tucows either conducted such a search and proceeded with actual knowledge of Holley and the Earl's Marks, or it was willfully blind by failing to make such inquiries.

57.     Tucows' bad faith is also shown by, upon information and belief, a business plan for registering and obtaining domain names, including the Infringing Domain, with a view to profiting from any trade mark value there might be in those domain names.

58.     On information and belief, Tucows has not made any use of the Infringing Domain in connection with the *bona fide* offering of any goods or services.

59.     On information and belief, Tucows and/or any predecessors-in-interest registered, trafficked in, and used the Infringing Domain to divert consumers from websites owned, used and maintained by Holley in connection with the Earl's Products to a website accessible under the Infringing Doman for Tucows' commercial gain by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the website.

60.     Tucows' registration, use, or trafficking in the Infringing Domain constitutes cybersquatting in violation of 15 U.S.C. § 1125(d), entitling Holley to relief.

61.     By reason of Tucows' acts alleged herein, Holley's remedy at law is not adequate to compensate it for the damages and injuries inflicted by Tucows, and Holley is thus entitled to injunctive relief pursuant to 15 U.S.C. § 1116.

62.     By reason of Tucows' acts alleged herein, Holley is entitled to recover Tucows' profits, actual damages and the costs of the action, or statutory damages under 15 U.S.C. § 1117(d), in an amount of one hundred thousand dollars ($100,000).

63.     This is an exceptional case making Holley eligible for an award of attorneys' fees under 15 U.S.C. §  1117(a).

### COUNT II:  Trademark Infringement Under 15 U.S.C. § 1114(1)

64.     Holley realleges and incorporates by reference Paragraphs 1 through 63 as if fully set forth herein.

65. As alleged herein, (a) Tucows' acts are likely to cause confusion, mistake, and to deceive with respect to the Earl's Marks and/or the Earl's Products, (b) Tucows' acts are likely to cause initial interest confusion among the general public with respect to Holley, the Earl's Marks, and/or the Earl's Products, and (c) Tucows has unfairly profited from its actions with respect to the Infringing Domain.

66. By reason of Tucows' activities, Holley has suffered damage to its reputation and the goodwill established by Holley in, and associated with, the Earl's Marks. If not enjoined, Tucows' activities will continue to harm Holley and its long-used and federally-registered Earl's Marks.

67. Tucows' activities have harmed, and if not enjoined, will continue to harm, the general public which has an interest in being free from confusion, mistake and deception.

68. By reason of Tucows' acts alleged herein, Holley's remedy at law is not adequate to compensate it for the injuries inflicted by Tucows and, accordingly, Holley is entitled to injunctive relief pursuant to 15 U.S.C. § 1116.

69. By reason of Tucows' acts alleged herein, Holley is entitled to recovery from Tucows of all amounts it is entitled to under 15 U.S.C. § 1117(a), including without limitation trebled damages.

70. This is an exceptional case making Holley eligible for an award of attorneys' fees under 15 U.S.C. § 1117(a).

## COUNT III: False Designation of Origin and Unfair Competition Under 15 U.S.C. § 1125(1)

71. Holley realleges and incorporates by reference Paragraphs 1 through 70 as if fully set forth herein.

72.     As alleged herein, (a) Tucows' acts are likely to cause confusion, or to cause mistake, or to deceive the relevant public that the Infringing Domain, and the websites and advertisements displayed at the Infringing domain, are authorized, sponsored or approved by or are affiliated with Holley, (b) Tucows' acts are likely to cause initial interest confusion among the general public with respect to Holley, the Earl's Marks and/or the Earl's Products, and (c) Tucows has unfairly profited from its acts with respect to the Infringing Domain.

73.     By reason of Tucows' activities, Holley has suffered damage to its reputation and the goodwill established by Holley in, and associated with, the Earl's Marks.  If not enjoined, Tucows' activities will continue to harm Holley and its long-used and federally-registered Earl's Marks.

74.     Tucows' activities have harmed, and if not enjoined, will continue to harm, the general public which has an interest in being free from confusion, mistake and deception.

75.     By reason of Tucows' acts alleged herein, Holley's remedy at law is not adequate to compensate it for the injuries inflicted by Tucows and, accordingly, Holley is entitled to injunctive relief pursuant to 15 U.S.C. § 1116.

76.     By reason of Tucows' acts alleged herein, Holley is entitled to recovery from Tucows of all amounts it is entitled to under 15 U.S.C. § 1117(a), including without limitation trebled damages.

77.     This is an exceptional case making Holley eligible for an award of attorneys' fees under 15 U.S.C. § 1117(a).

## COUNT IV:  Unjust Enrichment.

78.     Holley realleges and incorporates by reference Paragraphs 1 through 77 as if fully set forth herein.

79.     Tucows has taken and infringed upon the Earl's Marks for its own commercial benefit without compensation to Holley.  As a result, Tucows has unjustly profited from the goodwill and reputation associated with the Earl's Marks.  Accordingly, Holley seeks a full accounting and recovery from Tucows for the benefits and profits it has unjustly received.

### COUNT V: Common Law Unfair Competition.

80.     Holley realleges and incorporates by reference Paragraphs 1 through 79 as if fully set forth herein.

81.     The foregoing acts of Tucows, including unfairly using, and profiting from, the Infringing Domain and exploiting the good will in Holley's Earl's Marks, have injured Holley and constitute unfair competition, passing off, unjust enrichment and misappropriation in violation of applicable state common law.

### Jury Demand

Holley respectfully demands a jury on all issues so triable.

### Relief Sought

WHEREFORE, Holley respectfully requests that this Court:

a.   Enter judgment that Tucows has violated the rights of Holley in the Earl's Marks in violation of 15 U.S.C. § 1125(d);

b.   Enter judgment that Tucows has infringed the rights of Holley in the Earl's Marks in violation of 15 U.S.C. § 1114(1);

c.   Enter judgment that Tucows has violated the rights of Holley in the Earl's Marks in violation of 15 U.S.C. § 1125(a);

d.   Enter judgment that Tucows has been unjustly enriched as a result of violating Holley's rights in the Earl's Marks;

e.   Enter judgment that Tucows has engaged in unfair competition and have infringed the rights of Holley in the Earl's Marks in violation of the common law;

f.   Order Tucows to transfer the Infringing Domain (www.earls.com) to Holley;

g.  Order and enjoin Tucows, its agents, representatives, employees, assigns, and all persons acting in concert or privity with Tucows from the following activities:

    (i)  registering or using, in any manner, any Internet domain name that incorporates, in whole or in part, any of the Earl's Marks or any name, mark or designation confusingly similar thereto;

    (ii)  using any of the Earl's Marks, or any name, mark or designation confusingly similar thereto, in a manner that is likely to cause confusion regarding whether Tucows is affiliated or associated with or sponsored by Holley; and

    (iii)  assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to in the foregoing subparagraphs.

h.  Order Tucows to engage in corrective advertising to the extent necessary to correct any consumer confusion or misperceptions resulting from Tucows' unlawful acts;

i.  Order Tucows to account to Holley for, and disgorge, all profits Tucows has derived by reason of the unlawful acts complained of herein;

j.  Order Tucows to pay damages, and that those damages be trebled, under 15 U.S.C. § 1117(a); and

k.  Enter an Order providing Holley with all such other and further relief to which it may be justly entitled.

December 13, 2010                    Respectfully submitted,


                                */s/ E. Kenly Ames*

                                E. Kenly Ames
                                ENGLISH, LUCAS, PRIEST & OWSLEY LLP
                                1101 College Street; PO Box 770
                                Bowling Green, KY 42102-0770
                                Phone:  (270) 781-6500
                                Fax:  (270) 782-7782
                                E-mail: kames@elpolaw.com

                                **ATTORNEY FOR PLAINTIFF**
                                **HOLLEY PERFORMANCE PRODUCTS, INC.**